1

2

3

4

5          UNITED STATES DISTRICT COURT

6        NORTHERN DISTRICT OF CALIFORNIA

7

8    RONALD M. SINGLER,                        No. C 06-3373 SI (pr)

9              Petitioner,                      **ORDER DENYING HABEAS
                                                 PETITION**
10         v.

11   GOVERNOR SCHWARZENEGGER,

12             Respondent.
     _____/
13

14                              **INTRODUCTION**

15         Ronald M. Singler, an inmate at San Quentin State Prison, filed this <u>pro se</u> action seeking

16   a writ of habeas corpus under 28 U.S.C. § 2254.  This matter is now before the court for

17   consideration of the merits of the <u>pro se</u> habeas petition.  For the reasons discussed below, the

18   petition will be denied.

19

20                              **BACKGROUND**

21         Singler was convicted in Placer County Superior Court of second degree murder with use

22   of a firearm.  In 1983, he was sentenced to 15 years to life in prison.  Singler was convicted at

23   a court trial on a slow plea.[1]  His habeas petition does not challenge his conviction but instead

24

25

26   _____

27         [1]A "slow plea" was described in <u>People v. Wright</u>, 43 Cal. 3d 487, 496 (1987), <u>abrogation
     on other grounds recognized by</u> <u>People v. Mosby</u>, 33 Cal. 4th 353, 360 (Cal. 2004), as an agreed-

28   upon disposition of a criminal case which does not require the defendant to admit guilt, but
     results in a finding of guilt upon an anticipated charge, usually for a promised punishment.  The
     most obvious example of the slow plea is a bargained-for submission on the preliminary hearing
     transcript, in which the only evidence is the victim's credible testimony, defendant does not
     testify, and counsel presents no argument on defendant's behalf.  <u>See</u> <u>id.</u>

challenges a September 27, 2005 decision by Governor Schwarzenegger that reversed the May 18, 2005 decision of the Board of Prison Terms ("BPT") that found him suitable for parole.

The Governor identified the "gravity of the murder" and surrounding circumstances as the reasons for his determination that Singler was not suitable for parole. Resp. Exh. 2 (September 27, 2005 Governor's decision), pp. 1-2. The Governor noted Singler's favorable conduct in prison, but found evidence of "premeditation," "defiling" of the victim, and previous assaults on the victim to be sufficient bases on which to conclude that Singler's release from prison "would pose an unreasonable risk of danger to society at this time." Id. The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Singler sought relief in the California courts. The Placer County Superior Court denied his petition for writ of habeas corpus in 2005. See Petition, Exh. E, pp. 7-8. The California Supreme Court summarily denied his petition for writ of habeas corpus. See id. at 9-20.

Singler then filed his federal petition for a writ of habeas corpus. The court found cognizable one claim alleged in the petition: that the Governor's reversal of the BPT's decision violated Singler's due process rights because it lacked sufficient evidentiary support. The court ordered respondent to show cause why the writ should not issue. Respondent filed an answer and then Singler filed a traverse. The matter is now ready for a decision on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed at San Quentin State Prison in Marin County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state

judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

The California Supreme Court upheld the Governor's decision in a summary denial of Singler's habeas petition. The Placer County Superior Court's denial of his petition was summary as to whether there was insufficient evidence to support the Governor's decision to reverse the BPT's finding of suitability for parole.  Where, as here, the state court gives no reasoned explanation of its decision, an "independent review of the record" is the only means of deciding whether the state court's decision was objectively reasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  While the federal court sitting in habeas review need not "defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law." Fisher v. Roe, 263

F.3d 906, 914 (9th Cir. 2001), overruled on other grounds by Payton v. Woodford, 346 F.3d 1204, 1217 n.18 (9th Cir. 2003).

**DISCUSSION**

A.    Due Process Requires That Some Evidence Support a Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28[2]; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision.   Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).  The California Supreme Court has determined, as a matter of state law, that the Governor's decision must also satisfy the "some evidence" standard.  See In re Rosenkrantz, 29 Cal.4th 616, 676-677 (Cal. 2002), cert. denied, 538 U.S. 980 (2003).

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the Governor.   Sass, 461 F.3d at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56).  The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'"  Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457).  The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.

---

[2]The Attorney General argued that the question of whether Singler has a federally protected liberty interest in parole was still open because a rehearing was being sought in Sass. Regardless of its merit, this argument is now moot because the petition for rehearing has been denied. There is no longer any question about the finality of the Ninth Circuit's decision in Sass.

A critical issue in parole denial cases concerns the parole authority's use of evidence about the murder that led to the conviction.  Three Ninth Circuit cases provide the guideposts for applying the <u>Superintendent v. Hill</u> "some evidence" standard on this point: <u>Biggs v. Terhune</u>, 334 F.3d 910 (9th Cir. 2003), <u>Sass</u>, 461 F.3d 1123, and <u>Irons v. Carey</u>, No. 05-15275, slip op. 2469 (9th Cir. Mar. 6, 2007).  <u>Biggs</u> explained that the value of the criminal offense fades over time as a predictor of parole suitability:  "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . .  A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  <u>Biggs</u>, 334 F.3d at 916-17.  <u>Biggs</u> upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole."  <u>Id.</u> at 916.  Next came <u>Sass</u>, which criticized the <u>Biggs</u> statements as improper and beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." <u>Sass</u>, 461 F.3d at 1129.  <u>Sass</u> determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability.  <u>See id.</u> (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing).  <u>Sass</u> also put to rest any idea from <u>Biggs</u> that the commitment crime and pre-offense behavior only support the initial denial of parole.  Recently, <u>Irons</u> determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence.  <u>Irons</u> emphasized the fact that in all three cases (<u>Irons</u>, <u>Sass</u> and <u>Biggs</u>) in which the court had approved "a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense," "the decision was made before the inmate had served the minimum number of years required by

his sentence." <u>Irons</u>, slip op. at 2481.[3]  Interpreting this statement from <u>Irons</u> to suggest that the offense can only be relied on until the minimum number of years has been reached would suffer the same problem that <u>Sass</u> identified in <u>Biggs</u>: it is not the holding of the case.  The dicta in <u>Biggs</u> and <u>Irons</u> are speculative and do not determine when a denial of parole based solely upon the commitment offense or pre-offense behavior violates due process.  Neither logic nor <u>Irons</u> compel a decision that such reliance must cease when the prisoner reaches the minimum number of years in his sentence, such as the fifteenth year of a 15-to-life sentence.

The upshot of these three cases is that the BPT can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (<u>Sass</u>), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (<u>Biggs</u> and <u>Irons</u>). <u>Sass</u> did not dispute the principle that, other things being equal, a murder committed 50 years ago is less probative of a prisoner's current dangerous-ness than one committed 10 years ago.  Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to <u>Biggs</u> and <u>Irons</u>.  <u>Superintendent v. Hill</u>'s standard might be quite low, but it does require that the decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

What little guidance has come from the Supreme Court suggests that judicial review should be extremely deferential to the original decision-maker in the parole context.  In addition to the very low evidentiary standard that <u>Superintendent v. Hill</u> imposes, other Supreme Court comments suggest that the judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision.  See <u>Greenholtz</u>, 442 U.S. at 13.  "No ideal, error-free way to make parole-release decisions has been developed; the whole question has been and will continue to be the subject of experimentation involving analysis of psychological factors

---

[3]Interestingly, <u>Irons</u> was referring the actual number of years the inmate had been in prison and not the fictional number of years based on reductions for time credits.  In <u>Irons</u>, the inmate had been in custody 16 years on his 17-to-life sentence, having been convicted in 1985 and challenging at 2001 parole decision.  See <u>Irons</u>, slip op. at 2473-74.

combined with fact evaluation guided by the practical experience of decisionmakers in predicting future behavior.  Our system of federalism encourages this state experimentation." Id.; see also id. at 8.  In California, that deference applies with equal strength to the Governor's decision to reverse the parole board's finding of suitability.  See Rosenkrantz, 29 Cal.4th at 677 ("As with the discretion exercised by the Board in making its decision, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor").

Past criminal conduct is not some arbitrary factor like eye color that  has nothing to do with present dangerousness.  Recidivism concerns are genuine.  See Ewing v. California, 538 U.S. 11, 26 (2003) (O'Connor J.) (noting a report stating that over 60% of violent offenders were arrested again within three years of their release).  California's parole scheme does not offend due process by allowing the BPT to predict that an inmate presents a present danger based on a murder he committed many years ago.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies.  One must look to state law to answer the question, "'some evidence' of what?"

B.      State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years.  A first degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a minimum term of 15 years to life imprisonment.  See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal Code § 190.  The upshot of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPT panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a

manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[4] The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix of base

---

[4] The listed circumstances tending to show unsuitability for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner"; whether the prisoner has a previous record of violence, has an unstable social history, has previously engaged in a sadistic sexual offense, has a lengthy history of severe mental problems related to the offense or has demonstrated negative institutional behavior. 15 Cal. Code Regs. § 2402(c). The listed circumstances tending to show suitability for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2402(d).

terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime.  Some prisoners estimate their time to serve based only on the matrix.  However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires him first to be found suitable for parole.

The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.  Dannenberg, 34 Cal. 4th at 1070-71.  Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole").  The California Supreme Court's determination of state law in Dannenberg is binding in this federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

The California Supreme Court also has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable.  "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release."  Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

C.    Some Evidence Supports The Governor's Decision In Singler's Case

The crime was summarized in the Life Prisoner Evaluation Report available to the Governor:

According to the [Probation Officer's Report], Inspectors Smith and Landry accompanied by Mrs. Singler's friend, Mrs. Groves, went to the Singler's residence after obtaining a search warrant.  Upon examining the residence the officers noted what appeared to be

blood stains on the redwood deck and on various locations inside the house.  Ronald Singler drove up to the [residence] while the officers were examining the house.  During an initial questioning, he told Inspector Landry he had been at his friend Steve Sanderson's when he learned the police were at his residence looking for his wife.

During a subsequent interview, the defendant stated his wife had returned home from Sacramento at approximately 9 p.m.  Shortly after she arrived, they had an argument.  At one point during the argument, he slapped her across the face.  He stated his wife attempted to kick him.  He stated his wife then told him she was having affairs with other men and that she was going to take the kids and take him to the "cleaners."  The defendant stated at this point he became angry and lost total control.  He then walked to the garage where he obtained a .12 gauge shotgun.  He stated that he was going to use the shotgun to "show force" and to make her tell the truth about her affairs, but once he returned to the house he shot her.  He told the officers afterwards he took his children to the Sanderson residence.  He then returned to his home and began cleaning up the bloodstains and he removed his wife's body.

Petition, Exh. B (Life Prisoner Evaluation Report ), p.1.

Under state law, the Governor's decision to reverse a BPT finding of suitability for parole can be supported solely by facts of the commitment offense—beyond the minimum elements—that indicate that the prisoner is unsafe for release.  See Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th at 682-83.  Premeditation is not an element of Singler's commitment offense of second degree murder.  See Cal. Penal Code §§ 187(a), 189; CALJIC 8.20.  The Governor found "evidence in the record" that Singler killed his wife with premeditation.  Resp. Exh. 2 (September 27, 2005 Governor's decision), p. 1-2.  At his 2005 hearing, Singler testified that he left his wife in the front room, went to the garage, retrieved the shotgun, loaded it, then returned to the front room and shot her.  Resp. Exh. 3, p. 13-15.  The time it took Singler to retrieve the gun, load it, and return to his wife was sufficient to reflect on the idea of shooting his wife.  See People v. Mayfield, 14 Cal. 4th 668, 767 (1997) ("cold, calculated judgment may be arrived at quickly") (quoting People v. Thomas, 25 Cal.2d 880, 900 (1945)).

Moreover, Singler admitted that he previously assaulted the victim before the night of the murder—he "popped" her "a couple of times. . . ."  Resp. Exh. 3, p. 18.  The victim's friend and neighbor, Mrs. Groves, stated that Singler "physically and mentally" abused the victim.  Resp. Exh. 4, p. 3.  Mrs. Groves related an incident in which Singler, nude, threatened the victim with a shotgun one week prior to the murder.  Id.  The evidence of previous assaults supports the

10

inference that Singler had previously considered hurting the victim with the same weapon he ultimately used to murder her.  The Governor's finding that Singler committed the murder with premeditation showed a factor beyond the elements of Singler's commitment offense, and that weighs against a finding of suitability for release.  <u>Sass</u>, 461 F.3d at 1128-29; <u>see</u> <u>Dannenberg</u>, 34 Cal. 4th at 1071.

In his traverse, Singler alleges that he was acquitted of first degree murder at trial.  He argues the Governor's use of premeditation to justify a denial of parole constitutes punishment for a crime for which he was acquitted and thus violates the Fifth Amendment's prohibition against double jeopardy.  However, a denial of parole is not punishment for double jeopardy purposes.  <u>See</u> <u>Alessi v. Quinlan</u>, 711 F.2d 497, 501 (2d Cir. 1983) (denial of parole "is neither the imposition nor the increase of a sentence, and it is not punishment for purposes of the Double Jeopardy Clause. . . ").  Singler's sentence on his second degree murder conviction was 15-to-life and the Governor has not increased the punishment beyond that set when he was sentenced in 1983.  Therefore, the Governor's decision did not violate the Double Jeopardy Clause.  Moreover, even if the evidence at trial was insufficient to prove premeditation <u>beyond a reasonable doubt</u>, it does not necessarily follow that there was not <u>some evidence</u> of premeditation to support the Governor's denial of parole.  Singler's alleged first degree murder acquittal does not raise double jeopardy concerns, nor does it preclude a finding of premeditation in the parole suitability context.

Another factor tending to indicate unsuitability for parole is that "[t]he victim was abused, defiled or mutilated during or after the offense. . . ."  15 Cal. Code Regs. § 2402(c)(1).  The Governor found "[Singler's] conduct in disposing of Mrs. Singler, defiling her in the process, was akin to dumping garbage in the wild to be ravaged by animals."  Resp. Exh. 2 (September 27, 2005 Governor's decision), p. 2.  Singler's admission that he took the victim's body from the home and dumped it in a rural field provided support for the Governor's reliance on this factor.

A previous record of violence also weighs against a finding of suitability for parole.  15 Cal. Code Regs. § 2402(c)(2).  Singler had no previous criminal record, but there is evidence that the murder was not the first time Singler "inflicted or attempted to inflict serious injury on a

victim. . . ." Id.  The Governor observed:

> There is also evidence in the record that Mr. Singler had previously assaulted Mrs. Singler.  He told the 2005 Board that he had "popped her a couple of times" before the night of the murder and the Court of Appeal, affirming the judgment in his case, noted that Mrs. Singler had confided in a family member and a friend that Mr. Singler had threatened her and she feared he would harm her.  The appellate record also noted that, on the night of the murder, Mrs. Singler left her keys in the car because she anticipated a need for a fast get-away and even had arranged with a neighbor to call her that night to confirm she was safe.  That same neighbor, according to the probation report, reported that she had seen Mr. Singler threaten Mrs. Singler with a shotgun just one week before the murder.

Resp. Exh. 2, p. 2.  The evidence of previous assaults further supports the Governor's conclusion that Singler "would pose an unreasonable risk of danger to society at this time."  Id.

Upon an independent review of the record, the court concludes that there was some evidence to support the Governor's decision.  The California Supreme Court's denial of Singler's petition for writ of habeas corpus was not contrary to, nor an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court.  Singler is not entitled to the writ.

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits.  The clerk shall close the file.

IT IS SO ORDERED.

DATED: April 3, 2007

_____
SUSAN ILLSTON
United States District Judge